# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERICA BLOOM SIMCHON, | : | Civil No. 3:15-CV-01434 |
| ISAAC SIMCHON, | : | |
| NICHOLAS PADULA, | : | |
| ALIZA SEIBERT, and | : | |
| ANDREW SEIBERT, on behalf of | : | |
| themselves and others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| HIGHGATE HOTELS, LP, | : | |
| COVE HAVEN, INC., and | : | |
| STARWOOD HOTELS & RESORTS | : | |
| WORLDWIDE, INC., | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court are two motions for summary judgment filed by Defendants and a motion for class certification filed by Plaintiffs. (Docs. 154, 155, 159.) The court holds that Plaintiffs Erica Bloom Simchon and Isaac Simchon ("the Simchons") lack standing under the Racketeer Influence and Corrupt Organizations Act ("RICO") to pursue their claim against Defendant Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"). Thus, for the reasons that follow, the court will grant Starwood's motion for summary judgment, and deny as moot Highgate Hotels, LP and Cove Haven, Inc.'s motion for summary judgment and the Simchons' motion for class certification.

1

## PROCEDURAL HISTORY

The Simchons, and Plaintiffs Nicholas Padula ("Padula"), Aliza Seibert, and Andrew Seibert ("the Seiberts") (collectively, "Plaintiffs") initiated this action via a class action complaint on July 23, 2015, and filed an amended class action complaint on September 9, 2015. (Docs. 1, 8.) The amended complaint set forth five causes of action: violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count I); RICO (Count II); the New York General Business Law Deceptive and Unfair Practices Act by the Simchons and the Seiberts (Count III); common law fraud (Count IV); and unjust enrichment (Count V). (Doc. 8.) Defendants Cove Haven, Inc. ("Cove Haven"), Highgate Hotels, LP ("Highgate"), and Starwood (collectively, "Defendants") moved to dismiss the amended complaint. (Docs. 19, 21.) The court dismissed Plaintiffs' Pennsylvania Unfair Trade Practices and Consumer Protection Law claim (Count I), the Simchons' claim under the New York General Business Law Deceptive and Unfair Practices Act claim (Count III), the common law fraud claim (Count IV), and the unjust enrichment claim (Count V). (Doc. 67.) Further, the court held that Highgate could not be held liable for any claims prior to its acquisition of the properties at issue in 2012. (*Id.* at 5–6.)

On February 10, 2017, Starwood filed a motion for judgment on the pleadings. (Doc. 72.) Once ripe, the court denied Starwood's motion, but directed

Plaintiffs to file "a more definite statement pursuant to Rule 12(e) to clarify the nature of the RICO claim as asserted against each of the named defendants, and the nature of the enterprises that were alleged to have been operated."  (Doc. 104; Doc. 87, p. 16.)  Plaintiffs filed a statement pursuant to Federal Rule of Civil Procedure 12(e) on February 2, 2018.  (Doc. 108.)

On May 13, 2019, Starwood filed a motion for summary judgment, brief in support thereof, and a statement of facts.  (Doc. 154.)  Highgate and Cove Haven also filed a motion for summary judgment, supporting brief, and statement of facts.  (Docs. 155, 156, 157.)  The same day, Plaintiffs filed two motions for class certification – one for a class against Starwood and Cove Haven by the Simchons, and one for a class against Highgate and Cove Haven by Padula and the Seiberts.  (Docs. 159, 165.)  Plaintiffs also filed a motion for leave to amend the first amended complaint.  (Doc. 173.)  All five motions were fully briefed by all parties.  (Docs. 160, 166, 174, 177–179, 182–184, 186, 189, 194–196, 197, 207.)  On August 7, 2019, Starwood requested oral argument on its motion for summary judgment and the Simchons' motion for class certification.[1]  (Doc. 199.)

Thereafter, on November 15, 2019, this case was transferred to the undersigned.  On February 6, 2020, the court granted Plaintiffs' motion for leave to

---

[1] As it is within the court's discretion to grant oral argument, *see* M.D. Pa. L.R. 7.9, the court will deny Starwood's motion for oral argument.  (Doc. 199.)

amend the first amended complaint, but permitted the parties to file supplemental briefing on their summary judgment motions. (Doc. 202.) Plaintiffs filed their amended complaint on February 7, 2020, which Defendants answered on February 14 and 21, 2020. (Docs. 203, 204, 205.) The parties subsequently filed supplemental briefing for the pending summary judgment motions. (Docs. 206, 207, 208, 209.) Consequently, all pending motions are fully briefed and ripe for disposition.

On June 9, 2020, Highgate and Cove Haven filed a stipulation of partial dismissal with prejudice. (Doc. 211.) As indicated in the stipulation, Padula and the Seiberts settled their claims with Highgate and Cove Haven. (*Id.*) However, the stipulation expressly provided that the Simchons' RICO claims remained against Starwood and Cove Haven "during the limited period when Defendant Starwood owned and/or operated the subject premises in question prior to October 1, 2012." (*Id.*) Based on this stipulation, the court denied Padula and the Seiberts' motion for class certification against Highgate and Cove Haven. (Doc. 212.)

## RELEVANT FACTUAL BACKGROUND[2]

Beginning on at least January 1, 2002 through October 2012, Cove Haven owned, and Starwood operated Cove Haven Resort, Paradise Stream Resort, and

---

[2] In considering the instant motions, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inference therefrom in the light most favorable to the nonmoving party.

4

Pocono Palace Resort (the "Resorts").  (Doc. 154-3, p. 3; Doc. 187-2.)  While the record provided by the parties is murky as to the entities involved, for purposes of the court's decision, Cove Haven and Highgate assumed ownership of the Resorts in October 2012.  (Doc. 203, p. 7.)  Starwood operated the Resorts as "all-inclusive" resorts, which included the room rate, gratuity, taxes, meals, entertainment, and other activities at the Resorts.  (Doc. 154-2, ¶ 3; Doc. 154-5, pp. 20, 27; Doc. 154-6, p. 12.)

The Simchons, the only named Plaintiffs to stay at the Resorts during Starwood's period of operation, stayed at Paradise Stream Resort from February 24, 2011 through February 26, 2011.  At that time, an 18% gratuity was listed as a separate line item on all reservations, confirmations, pre-bills, and statements, and was disclosed to guests at the time a reservation was made and at check-in.  (Doc. 154-2, ¶ 5.)  The parties dispute the purpose of collecting the 18% gratuity.  Starwood avers that it was collected "to be used, in part, to fund staff wages and salaries throughout the year," and the "intention of the gratuity was to help fund payroll of all the Resort staff throughout the year, even during seasonal downturns, and avoid seasonal layoffs."  (*Id*. ¶ 6.)  The Simchons submit that the gratuity was collected "for the *overall revenue* of the resorts."  (Doc. 187, p. 5) (emphasis in original).  Although called a gratuity, the Simchons aver that "the gratuity collected was simply additional revenue for the Resorts, 'revenue just like hotel

5

revenue, food revenue, any revenue you want, it was revenue.' The gratuity collected was not used to offset any cost of the staff at the Resorts." (*Id.* at 5–6.)

The Simchons were notified of the 18% gratuity prior to their February 2011 stay, and also when they arrived at the Resorts. Although the parties debate when the final price was paid, the Simchons paid the amount represented to them when they made their reservation and at check-in, including the 18% gratuity. Isaac Simchon testified that he and his wife "didn't mind the gratuity." (Doc. 154-6, p. 11.)

This case ultimately revolves around the 18% gratuity paid by the Simchons. The Simchons testified that they understood that the gratuity was for "tips for the waiters and waitresses at restaurants and housekeeping." (Doc. 154-2, ¶ 28.) Representing the gratuity as a tip, without that money being paid directly to the employees, was a material misrepresentation according to the Simchons. (*Id.* ¶ 30.) However, the Simchons testified that they normally tipped wait staff and housekeepers at hotels. (*Id.* ¶ 31.)

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'"  *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial."  *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted); *see also* Fed. R.

Civ. P. 56(c)(4) (establishing requirements for affidavits or declarations filed in support of or opposition to a motion for summary judgment). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Critically, the court is not required to go on a fishing expedition in search of relevant evidence. The court is only required to consider the evidence that the parties cite in their summary-judgment filings. Fed. R. Civ. P. 56(c)(3).

Summary judgment will generally be appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Starwood raises three arguments in its motion for summary judgement: (1) the Simchons lack standing to pursue a RICO claim; (2) the Simchons' RICO claim is time-barred; and (3) the Simchons cannot establish the element of a RICO claim. Because the court finds that the Simchons do not have standing to pursue their RICO claim, the court will not address Starwood's remaining two arguments.

### A. The Simchons do not have standing to pursue their RICO claim

In addition to the Article III standing requirements,[3] a plaintiff must also satisfy the RICO standing requirements as set forth in 18 U.S.C. § 1964(c). Section 1964(c) confers standing upon "any person injured in his business or property by reason of violation of section 1962 of this chapter." The Third Circuit has interpreted this section as "requiring a RICO plaintiff to make two related but analytically distinct threshold showings." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). Specifically, a plaintiff must show: "(1) that the plaintiff suffered injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. §1962." *Id.* (citations omitted). While "RICO is to be read broadly," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

---

[3] The court will address RICO's standing requirements and will assume for the sake of its discussion that the Simchons otherwise meet the Article III standing requirements. Article III standing requires that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

497 (1985), "section 1964(c)'s limitation of RICO standing to persons 'injured in [their] business or property' has a 'restrictive significance, which helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff.'" *Maio*, 221 F.3d at 483 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Steele v. Hospital Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994)). Therefore, "a showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Id.* (quoting *Steele*, 36 F.3d at 70). The injury requirement "can be satisfied by allegations and proof of actual monetary loss, i.e. an out-of-pocket loss." *Id.* (collecting cases).

As to the second requirement to establish RICO standing, a plaintiff must show "that a RICO predicate offense 'not only was a 'but for' cause of injury, but was the proximate cause as well.'" *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, --- F.3d ---, 2020 WL 4197525, at *3 (3d Cir. July 22, 2020) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)). This proximate causation element is used in the civil RICO context "as a limiting principle intended to stymie a flood of litigation, reserving recovery for those who have been directly affected by a defendant's wrongdoing." *Id.* at *4 (citing *Holmes v. Sec. Inv'r Protection Corp.*, 503 U.S. 258, 268 (1992)). The focus of proximate causation is "'on the directness of the relationship between the conduct and the

harm' rather than 'the concept of foreseeability.'" *Id.* (quoting *Hemi Grp., LLC*, 559 U.S. at 12).

In *St. Luke's Health Network, Inc. v. Lancaster General Hospital*, the Third Circuit recently emphasized the importance of the rationale for requiring directness of injury in the RICO standing context. First, "indirect injuries make it difficult 'to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors.'" *Id.* (quoting *In re Avandia Mktg.*, 804 F.3d 633, 642 (3d Cir. 2015)). Second, "indirect injuries risk double recovery so the 'courts would have to adopt complicated rules apportioning damages to guard against this risk.'" *Id.* (quoting *In re Avandia Mktg.*, 804 F.3d at 642). And third, "directly injured victims can be counted on and are best positioned to 'vindicate the law as private attorneys general,' so there is no need to extend civil RICO's private right of action to those whose injuries are more remote." *Id.* (quoting *Holmes*, 503 U.S. at 269–70). Demonstrating that there is a direct relationship between the asserted injury and the alleged injurious conduct requires that the alleged manipulation must not be "'purely contingent' on another event or action." *Id.* (quoting *Holmes*, 503 U.S. at 269, 270). Furthermore, intervening factors can break the causation chain. *Id.*

Starwood argues that the Simchons admitted that they did not suffer any financial injury. (Doc. 154-1, p. 14–15.) Specifically, the Simchons paid the

11

amount that was quoted to them at the time of reservation and no more. (*Id.*) Further, Starwood avers that the Simchons were not deprived of any benefit during their stay – they were not refused service by waitstaff and housekeeping cleaned their room. (*Id.* at 15–16.) Thus, Starwood submits that the Simchons' assertion that Starwood "did not properly allocate the gratuity to the wait staff and/or housekeeping staff is of no consequence" because the Simchons suffered no financial or property loss. (*Id.* at 16.)

The Simchons argue that their injury is the out-of-pocket loss of the itemized gratuity collected by Starwood, which "deceptively inflated the actual room rate paid by the Simchons" and "flowed directly from the deceptive misrepresentations" that the gratuity was being paid to the staff. (Doc. 186, p. 20.) Starwood purportedly deceived the Simchons by inflating the room rate by the 18% gratuity, that was actually an additional 18% revenue stream. (*Id.*) This deception caused the Simchons' financial loss and injury. (*Id.*) According to the Simchons, but for this deception, the Simchons could have: (1) stayed at the Resort and not tipped the staff; (2) tipped less than the included 18% gratuity; or (3) chosen not to stay at the Resort. (*Id.*) The Simchons argue that each scenario demonstrates their financial loss due to Starwood's deception. (*Id.*)

For the reasons that follow, the court rejects the Simchons' claim that they suffered a concrete financial injury. Furthermore, the court finds that, even if the

Simchons suffered an injury, they have failed to establish that Starwood's alleged deception was the proximate cause of their injury.

The Simchons argue that their injury is the out-of-pocket loss of the 18% gratuity collected by Starwood, which "deceptively inflated the actual room rate paid by the Simchons" and "flowed directly from the deceptive misrepresentations" that the gratuity was being paid to the staff. (Doc. 186, p. 20.) However, the Simchons must make "two related but analytically distinct threshold showings," which they have failed to do here. *See Maio*, 221 F.3d at 483. First, the Simchons must show that they suffered an injury to their business or property, which in this case, requires proof of a concrete financial loss. *See id.* The Simchons do not argue that paying the 18% gratuity itself is the injury. In fact, they testified that they "didn't mind the gratuity." The Simchons' alleged injury is inextricably tied to the second distinct threshold showing – that the Simchons injury was proximately caused by Starwood's RICO violation. *See id.* Here, the alleged injury is that they paid the gratuity *and* it did not go to the employees as they believed it should. Mrs. Simchon made this exact point during her deposition. She testified that when she goes somewhere, she gives "a specific tip depending on [the] services," but she is "not being told what to give." (Doc. 154-5, p. 17.) However, "In this place, they told us what exactly what we had to give. So hearing that these tips didn't go to the people where they deserved it, *I mean that's pretty*

13

*much a problem.*"  (*Id.* (emphasis added).)  Had the gratuity been paid to the employees, the Simchons would not have taken issue with paying the gratuity.

Thus, the Simchons' alleged injury is conflated with the RICO violation, i.e. there is no injury without the violation.[4]  Without tying the two distinct threshold showings together, the Simchons cannot establish standing under RICO.  Courts within the Third Circuit have similarly found that plaintiffs lacked RICO standing when they could not show an injury to business or property, and the distinct and separate showing that the injury was proximately caused by the defendant's RICO violation.  *See, e.g.*, *Maio*, 221 F.3d at 488 (holding that the plaintiffs "cannot establish that they suffered a tangible economic harm compensable under RICO unless they allege that health care they received under [defendant's] plan actually was compromised or diminished as a result of [defendant's] management decisions challenged in the complaint"); *Anderson v. Ayling*, 396 F.3d 265, 271–72 (3d Cir. 2005) (affirming the district court's dismissal of plaintiffs' complaint stating that the injuries of termination of employment and corruption in their local union were not cognizable injuries that created RICO standing); *Knit With v. Knitting Fever, Inc.*, Nos. 08-4221, 08-4775, 2012 WL 2938992, at *5–14 (E.D. Pa. July 19, 2012)

---

[4] In making this finding, the court notes that neither party cited to any civil RICO precedent that involves a factually similar scenario, with or without a standing challenge.  Further, the court conducted its own exhaustive nationwide search of case law and was unable to locate any factually analogous precedent from any jurisdiction.  The court finds the absence of precedent to be significant in evaluating the standing question in this case because it appears to the court, for the reasons explained in this opinion, that the Simchons' argument as to standing is weak.

(finding that plaintiff's damages – incurred attorneys' fees, costs relating to an investigation and recall of products, costs of replacement goods, harm to goodwill and reputation, and costs of and lost profits from the goods at issue – did not "constitute concrete financial loss to business or property or were not proximately caused by Defendants' predicate acts in furtherance of the scheme"), *aff'd*, 625 F. App'x 27 (3d Cir. 2015).

Next, even assuming that the Simchons have a cognizable injury, the court finds that they have not adequately established the directness of the injury in the RICO standing context. *See St. Luke's Health Network, Inc.*, 2020 WL 4197525 at *4. First, it is difficult to ascertain the amount of the damages attributable to Starwood's alleged misrepresentation, as distinct from other, independent factors. *Id.* The Simchons cannot identify the exact amount of their out-of-pocket financial loss. Both testified regarding their tipping and gratuity habits. (*See generally* Docs. 154-5, 154-6.) Mrs. Simchon testified that it depends on the situation, but at restaurants, they usually tip "double the tax or give 15 to 20 percent of what the actual bill was," or, at a buffet, they "would probably just give like maybe $5, a couple of bucks there when they would brought the soda and drinks and so on." (Doc. 154-5, p. 10.) Both Simchons testified that they tipped the bartender during their stay. (*Id.* at 17; Doc. 154-6, p. 15–16.) Mr. Simchon testified that his standard tip when going out to dinner is 15 percent, but will tip more than that if

the service is good. (Doc. 154-6, p. 15.) When staying at a hotel, Mr. Simchon generally tips the housekeeping staff 15 percent and bases it "on the rate of the room" and "on actual service." (*Id.*) He also tips employees who help with luggage at hotels. (*Id.* at 16.) Furthermore, Mr. Simchon testified that if the gratuity was not included in the bill, he "would have paid the waiters, waitresses, housekeeping because they rely on the tips." (*Id.* at 20.) Based on this testimony, and the arguments presented in their briefs, the court cannot ascertain the exact amount of the Simchons out-of-pocket financial loss.

In any event, whatever amount of money would comprise the loss (if that amount could be ascertained), this purported loss is directly tied to the fact that the employees did not receive the gratuity. The Simchons concede that they do not begrudge paying the 18% gratuity to Starwood. (*See, e.g.*, Doc. 154-6, p. 11.) Rather, it is the fact that the waitstaff and housekeeping staff did not ultimately receive the gratuity because Starwood diverted the gratuity to general revenue (according to the Simchons) that causes their injury. (*See, e.g.*, Doc. 154-5, p. 17.) Thus, as previously stated, it is impossible to separate the alleged injury from the alleged RICO violation.

Second, allowing the Simchons to recover for their indirect injury risks double recovery. The court takes judicial notice of the companion case to this action, *Henkel v. Highgate Hotels, LP and Cove Haven Inc.*, No. 3:15-cv-1435,

which is also pending before this court.  In that case, the employees of Highgate and Cove Haven are pursuing Fair Labor Standards Act and Minimum Wage Act claims, in addition to other claims, on behalf of themselves and a class and collective of individuals similarly situated.  (*See Henkel*, No. 3:15-cv-1435, Doc. 110.)  The *Henkel* action was initiated the same day as the Simchons' action, July 23, 2015, and is currently ongoing.[5]  Because the employees are seeking to recover the same 18% gratuity that the Simchons paid as guests, and which the Simchons claim as their loss in this case, the court is presented with a situation in which it would have to apportion damages between each set of plaintiffs if both prevail.  The court notes that this potential result seems to undermine the gist of the Simchons' complaint that they believed the employees would receive the 18% gratuity that they willingly paid.

Lastly, because the employees are the directly injured victims of the alleged RICO violation (the diversion of the guests' gratuity payments), they are best positioned to "vindicate the law as private attorneys general."  Accordingly, there is no need to extend RICO standing to the Simchons, whose injuries are far more remote.  *See St. Luke's Health Network, Inc.*, 2020 WL 4197525 at *4.  As the Third Circuit stated, demonstrating that there is a direct relationship between the

---

[5] The court notes that the same counsel – Matthew Blit, Esquire and Russell Moriarty, Esquire of Levin & Blit, PLLC – are representing both groups of plaintiffs.

Simchons' alleged injury and the alleged injurious conduct requires that the alleged manipulation must not be "'purely contingent' on another event or action."  Here, the Simchons' alleged loss of the 18% gratuity did not become an injury unless/until it was not received by the employees.  Therefore, the injury is purely contingent on the employees not receiving the funds.  This "event or action" of Starwood failing to pay the gratuity to the employees is an intervening factor that causes a break in the causation chain that began with the Simchons knowingly and willingly paying the 18% gratuity.

Thus, because the Simchons cannot meet either requirement for RICO standing, the court holds that they do not have standing to bring their claim.  The court will grant Starwood's motion for summary judgment in this regard.  Furthermore, although not raised by the parties, because the court finds that the Simchons lacks standing to bring their RICO claim against Starwood, they also lack standing against Cove Haven, which stands in the same position as Starwood in this action.  Therefore, Cove Haven will be dismissed from this action.

### B. Remaining outstanding motions

There are two remaining motions before the court – Highgate and Cove Haven's motion for summary judgment, and the Simchons' motion for class certification against Starwood and Cove Haven.

### 1. Highgate and Cove Haven's motion for summary judgment will be denied as moot

In the stipulation of dismissal, Padula and the Seiberts agreed to dismiss their claims against Highgate and Cove Haven with prejudice. (Doc. 211.) This stipulation terminated this action against Highgate. However, the parties could not agree to dismiss Cove Haven entirely from this case because of its involvement with Starwood during the "limited period when Defendant Starwood owned and/or operated the subject premises in question prior to October 1, 2012." (*Id.*) Because of this, the parties also could not agree that Highgate and Cove Haven's pending motion for summary judgment was moot.

The court, having reviewed the motion for summary judgment, will deny the motion for summary judgment as moot. (Doc. 155.) The motion only discusses action taken by Highgate and Cove Haven after Highgate purchased the resorts in October 2012. Accordingly, because all claims against Highgate and Cove Haven have been dismissed with prejudice for that time period, it is appropriate for the court to deny this motion as moot.

### 2. The Simchons motion for class certification against Starwood and Cove Haven will be denied as moot

Because the Simchons lack standing for their RICO claim against Starwood and Cove Haven, they cannot pursue class certification for their RICO claim. *See Hildebrand v. Dentsply Int'l, Inc.*, 264 F.R.D. 192, 197 (E.D. Pa. 2010) (citing

*Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000) ("an individual who lacks standing may not represent a class").  Thus, the motion for class certification, Doc. 159, will be denied as moot.

## CONCLUSION

For the reasons stated herein, the court will grant Starwood's motion for summary judgment, Doc. 154.  Additionally, the court will deny as moot Highgate and Cove Haven's motion for summary judgment, Doc. 155, and the Simchons' motion for class certification against Starwood and Cove Haven, Doc. 159.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 8, 2020